## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TAMER G. ATALLA, NEIL NAIK, HEMANG PATEL, JAYESH PATEL, KALPANA B. PATEL, AND JOHN DOES 1-200,<br><br>   Plaintiffs,<br><br>vs.<br><br>7-ELEVEN, INC., a wholly owned subsidiary of SEVEN-ELEVEN JAPAN CO., LTD., a wholly owned subsidiary of SEVEN AND I HOLDINGS CO. LTD.<br><br>   Defendant. | CIVIL ACTION NO. |

## COMPLAINT

Plaintiffs Tamer G. Atalla ("Atalla"), Neil Naik ("Naik"), Hemang Patel ("H. Patel"), Jayesh Patel ("J. Patel"), and Kalpana B. Patel ("K. Patel") (collectively "Plaintiffs"), by and through their attorney, Marks & Klein, LLP, complain of Defendants 7-Eleven, Inc. ("SEI"), Seven-Eleven Japan Co., Ltd. ("Seven-Eleven"), and Seven and i Holdings Co., Ltd. ("Seven and i") (SEI, Seven-Eleven Japan and Seven and i will collectively be referred to as "7-Eleven"), and state as follows:

## SUMMARY OF ACTION

1. 7-Eleven, a seeming American icon, is in reality a Japanese corporation that misrepresents and misclassifies its relation with its store operators as franchisees when they are in fact, employees.

2. Competitive store operators at the 300-500 Wawa and Quick Chek convenience stores in the New Jersey/New York area perform the same functions and duties as the 7-Eleven

store managers but are properly classified as employees. In contrast, 7-Eleven intentionally misclassifies its store operators as franchisees in order to increase corporate profits and avoid paying overtime, medical and pension benefits, FICA and other state and federal employer taxes.

3.      7-Eleven engages in three (3) specific fraudulent schemes that are abusive of its store operators in that it violates the New Jersey Fair Labor Standards Act, the New Jersey Franchise Practices Act, and the New Jersey Law Against Discrimination.

**Fraudulent and Undisclosed Employment Relationship**

4.      7-Eleven, through its multiple Japanese subsidiaries and its corporate parent, engages in the fraudulent misrepresentation of its relation with its store operators in order to avoid paying store operators minimum and overtime wages, medical, pension, and other employment-related benefits.

5.      7-Eleven purposefully mischaracterizes its relationship with franchisees to avoid labor and employment laws. This employment relationship is evidenced by the high level of control that is exerted by 7-Eleven through:

(a) Regulation of vendors and product supply;

(b) Processing franchisees' payroll through its own internal payroll system;

(c) Setting of pricing, advertising and promotional materials;

(d) Intense daily oversight by Market and Zone managers of all store operations;

(e) Requirement that store operators wear corporate uniforms;

(f) All store bookkeeping and accounting done by 7-Eleven corporate;

(g) Failure to pay overtime or other corporate benefits, such as pensions or medical, to store owners who routinely work 80+ hours per week;

(h) Franchisee/store managers cannot withdraw money without corporate approval.

(i)   In many locations, store temperature is even set by 7-Eleven corporate in Dallas, Texas.

6.      7-Eleven's employment relationship is also based on the fact that 7-Eleven and its franchisees are engaged in the same type of business, and franchisees are not permitted to engage in business activity outside of 7-Eleven operations in their role as franchisees.

7.      7-Eleven is the actual employer of all of the employees who work in its 40,000+ store locations, and is ultimately the party responsible for I-9s and related compliance.

8.      7-Eleven, as an undisclosed employer, has for many years, deprived franchisees/employees of minimum wage/overtime, pension, and health benefits, FICA, Social Security and Pension benefits.

9.      7-Eleven and its management have violated the federal Fair Labor Standards Act ("FLSA") and the laws of various states with respect to how it classifies its employees.

**Violations of the New Jersey Franchise Practices Act**

10.      7-Eleven manipulates the terms of its franchise contact and deprives its store operators of equity in their stores.

11.      7-Eleven has steadily increased franchise fees for incoming franchisees, to the detriment of existing franchisees. Franchisee stores equity is rapidly declining due to the excessively high franchisee fee being charged to incoming operators.

12.      In recent years, 7-Eleven changed the formula it uses to calculate franchise fees, which dramatically increased the fees, especially for locations grossing over $800,000.00.

13.      Then, in 2012, 7-Eleven totally abandoned the mathematical formula it previously used to determine franchise fees, and has since abused its discretion in determining what is an appropriate franchise fee for each location. This new subjective and one-sided analysis has all

but destroyed franchisee equity in well-performing stores and has made it extremely difficult to sell a location at fair value.

14.     7-Eleven has abused its discretion in requiring franchisees to acquire and price products from required vendors according to 7-Eleven's mandates. While 7-Eleven's franchise agreement provides the franchisor with certain powers, the abuse of discretion has changed the parties' business relationship rendering it both unrecognizable and unprofitable for franchisees.

**Violations of the New Jersey Law Against Discrimination**

15.     7-Eleven routinely disrupts franchise daily operations using intimidation and bullying tactics that not only violate the New Jersey Law Against Discrimination ("LAD"), but also make it impossible for franchisees to conduct productive day-to-day operations. Instead, they live and work in fear.

16.     In the aggregate, 7-Eleven places a stranglehold on its franchisees, particularly Asian/Pacific Rim/Middle Eastern First/Generation American franchisees, and has taken aggressive actions to abuse contractual rights and diminish franchisees' value in their own investment.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the parties are diverse of citizenship, and the amount in controversy on each of the counts set forth below exceeds the sum of $75,000 exclusive of interest and costs.

## THE PARTIES

18.     Tamer G. Atalla is a resident of the State of New Jersey.

19.     Neil Naik is a resident of the State of New Jersey.

20.     Hemang Patel is a resident of the State of New Jersey.

4

21.     Jayesh Patel is a resident of the State of New Jersey.

22.     Kalpana B. Patel is a resident of the State of New Jersey.

23.     John Does 1-200, who are residents of the State of New Jersey, are presently unknown but, upon information and belief, may have rights and claims consistent with those of Plaintiffs in this matter, and once identified, may be named as additional party plaintiffs.

24.     Defendant 7-Eleven, Inc. is a Texas Corporation. It maintains a place of business at 1722 Routh Street, Suite 1000, Dallas, Texas 75201. Defendant 7-Eleven is a wholly-owned subsidiary of Seven-Eleven Japan Co., Ltd.

25.     Defendant Seven-Eleven Japan is a Japanese Corporation. It maintains a principal place of business at 8-8 Nibancho, Chiyoda-ku, Tokyo 102-8452, Japan. Seven-Eleven Japan is a wholly-owned subsidiary of Seven and i Holdings Co. Ltd.

26.     Defendant Seven and i is a Japanese Corporation. It maintains a principal place of business at 8-8 Nibancho, Chiyoda-ku, Tokyo 102-8452, Japan.

## FACTS COMMON TO ALL COUNTS

27.     7-Eleven is a fraudulent franchisor, and the true relationship between Plaintiffs and 7-Eleven is one of employer-employee.

28.     By and through Defendants' deceptive scheme, Plaintiffs are employees/fraudulent franchisees.

**Tamer G. Atalla**

29.     Atalla is a 7-Eleven franchisee in good standing.

30.     Atalla operates a store (Store # 11011) in Villas, New Jersey.

**Neil Naik**

31.     Naik is a 7-Eleven franchisee in good standing.

32.     Naik operates a store (Store # 11449) in Hillsborough, New Jersey.

**Hemang Patel**

33.     H. Patel is a 7-Eleven franchisee in good standing.

34.     H. Patel operates a store (Store # 32238) in Bayonne, New Jersey.

**Jayesh Patel**

35.     J. Patel is a 7-Eleven franchisee in good standing.

36.     J. Patel operates a store (Store # 11040) in Belford, New Jersey.

**Kalpana B. Patel**

37.     K. Patel is a 7-Eleven franchisee in good standing.

38.     K. Patel operates a store (Store # 10955) in Milltown, New Jersey.

39.     Plaintiffs, along with more than 150 other franchisees, have formed an association to combat the deceptive and ill-willed practices of the franchisor, 7-Eleven.

**7-Eleven's Manipulation**

40.     7-Eleven manipulates the terms of its franchise contract and deprives franchisees of equity in their stores.

41.     For the past several years, 7-Eleven has steadily increased franchise fees to be paid by incoming franchisees, to the detriment of existing franchisees seeking to sell their stores. As a result, franchisees' store equity is rapidly reclining due to the excessively high franchise fee.

42.     Upon information and belief, in recent years, 7-Eleven has also changed the formula it uses to calculate franchise fees, and has drastically increased the fees based upon a subjective rather than mathematical standards—especially for 7-Eleven locations grossing over $800,000.

43.     In its 2012 franchise agreement, 7-Eleven formally abandoned the mathematical formula it historically used to determine franchise fees, and is abusing its discretion in determining what is an appropriate franchise fee.

44.     As a result of the various actions that it has taken to manipulate fees owed by incoming franchisees, 7-Eleven has adversely affected franchisee equity in well-performing stores, and has made it extremely difficult for Plaintiffs and others similarly situated to sell a location for fair market value.

45.     7-Eleven has also abused its discretion in requiring franchisees to acquire and price products from required vendors according to 7-Eleven's strict mandates.

46.     While 7-Eleven's franchise agreement provides the franchisor with certain powers, the abuse of discretion has changed the parties' business relationship, making it both unrecognizable and unprofitable for franchisees.

**7-Eleven's Retaliatory and Discriminatory Measures, and the Law Against Discrimination**

47.     7-Eleven is targeting certain owners, many of whom run successful operations, and is making serious allegations of labor and other violations, without even a scintilla of proof.

48.     7-Eleven routinely targets Asian/Pacific Rim/Middle Eastern First/Generation American franchisees, due to their perceived unfamiliarity with United States laws.

49.     By way of example only, when interrogating Asian/Pacific Rim/Middle Eastern First/Generation American franchisees, and making **<u>unannounced</u>** visits to their stores, 7-Eleven representatives routinely make derogatory references to Asian/Pacific Rim/Middle Eastern First/Generation American franchisees.

50. 7-Eleven by way of its harassing and targeted faux "investigations" discriminates against certain franchisees based upon their race and national origin in violation of the New Jersey Law Against Discrimination ("LAD").

51. Regardless of the employment status of Asian/Pacific Rim/Middle Eastern First/Generation American franchisees—as employees or independent contractors—they are covered by the LAD.

**7-Eleven is the Employer**

52. 7-Eleven's franchisee abuses are further magnified by the fact that it purposefully mischaracterizes its business relationship with franchisees to avoid labor and employment laws.

53. Specifically, 7-Eleven's franchise agreement mischaracterizes the parties relationship as one of an independent contractor/franchisor relationship:

> **Independent Contractor**. You and we agree that this Agreement creates an arm's-length business relationship and does not create any fiduciary, special or other similar relationship. You agree: (a) to hold yourself out to the public as an independent contractor; (b) to control the manner and means of the operation of the Store; and (c) to exercise complete control over and responsibility for all labor relationships and the conduct of your agents and employees, including the day-to-day operations of the Store and all Store employees. You and your agents and employees may not: (i) be considered or held out to be our agents or employees or (ii) negotiate or enter any agreement or incur any liability in our name, on our behalf, or purporting to bind us or any of our or your successors-in-interest. Without in any way limiting the preceding statements, we do not exercise any discretion or control over your employment policies or employment decisions. All employees of the Store are solely your employees and you will control the manner and means of the operation of the Store. No actions you, your agents or employees take will be attributable to us or be considered to be actions obligating us.

54. While attempting to insulate itself from franchisee actions by characterizing the franchise relationship as distinct from an employment agreement, 7-Eleven, in actuality, significantly controls the day-to-day operations of its franchisees, rendering the parties' relationship one of *de facto* employment.

55. This relationship is evidenced by a high level of control that is exerted by 7-Eleven over the following, including, but not limited to:

8

(a) Regulation of vendors and product supply;

(b) Processing franchisees' payroll through its owner internal payroll system;

(c) Regulation of product pricing, advertising and promotional materials;

(d) Intense daily oversight by Market and Zone Managers of franchisee operations;

(e) Requirement that franchisees wear 7-Eleven emblazoned uniforms;

(f) Franchisees cannot control the volume on their televisions and, rather, 7-Eleven controls that from their corporate headquarters in Dallas, Texas.;

(g) Franchisees are unable to change the temperature in their store and, rather, 7-Eleven controls that from their corporate headquarters in Dallas, Texas;

(h) Bookkeeping and all accounting done by corporate; and

(i) Franchisees cannot withdraw money without corporate approval.

56.    Due to 7-Eleven's neglect of the parties' true business relationship, 7-Eleven has deprived Plaintiffs, and all members of the Association to which Plaintiffs belong, of the following employment-related benefits, including, but not limited to:

(a) Federal Insurance Contributions Act ("FICA") tax;

(b) Social Security Withholding;

(c) Unemployment Withholding;

(d) Health Insurance (which neglect is soon to be exacerbated by a shift in governmental policy); and

(e) Workers' Compensation Insurance.

57.    The employment relationship is also based on the fact that 7-Eleven and its franchisees are engaged in the same type of business, and franchisees are not permitted to engage in business activity outside of 7-Eleven operations in their role as franchises.

58.     As the employer of all employees who work in its 40,000+ stores locations, 7-Eleven is ultimately the party responsible for I-9 and related compliance that is being pawned off on franchisees.

59.     Furthermore, on the franchisees' In-Store Processing ("ISP") system, the franchisee login location is designated for "employee".

**Unfair Competition**

60.     Upon information and belief, Wawa, Inc. ("Wawa") and QuickChek have 300-500 stores in the New Jersey/New York region. Much like 7-Eleven, Wawa and QuickChek provides customers with food and beverage on a 24-7 basis.

61.     While Store Operators at Wawa and QuickChek perform the same functions and duties as the 7-Eleven store managers and are properly classified as employees, 7-Eleven operators intentionally misclassified as franchisees in order to increase corporate profits and avoid paying FICA and other employer taxes.

62.     Specifically, Wawa and QuickCheck properly classify their store operators as employees, unlike 7-Eleven, who attempts to avoid providing employment-related benefits to its misclassified employees.

**7-Eleven is (Illegally) Selling Security Interests in the Company**

63.     As 7-Eleven franchisees are nothing more than glorified employees, 7-Eleven is selling security interests to these franchisees/employees (by way of their franchise investment) without proper disclosure in violation of Rules established by the Securities Exchange Commission.

**7-Eleven is Violating the New Jersey Franchise Practices Act**

64.     As evidenced in the matter of *7-Eleven v. Sodhi*, No. 3:13-cv-03715 (D.N.J.)(MAS)(DEA), 7-Eleven routinely ignores the sixty (60) day notice requirement under the New Jersey Franchise Practices Act ("NJFPA"), and engages in illegal self-help actions to interrupt franchisee operations.  In that case the United States District Court for the District of New Jersey agreed with the franchisee in his application for temporary restraints, determined that 7-Eleven ignored the NJFPA notice requirement and temporarily enjoined 7-Eleven from taking any further action to terminate the franchisee's business pending further proceedings.  *See* Exh. A, *7-Eleven v. Sodhi* Order; *see also*, Exh. B, *7-Eleven v. Sodhi* Hearing Transcript.

65.     In other words, rather than properly seeking relief from the Court, 7-Eleven targets particular franchisees, threatens them, and takes matters into its own hands by stealing equipment, stopping vendor supplies, ceasing financing, and otherwise shuts down franchisee operations.

66.     7-Eleven imposes unreasonable standards of performance upon Asian/Pacific Rim/Middle Eastern First/Generation American franchisees.

67.     These unreasonable standards have recently been evidenced by 7-Eleven's attempt to place blame for I-9 non-compliance on franchisees, despite the fact that franchisees do not have the capacity to E-Verify, like franchisees do in other systems.

**7-Eleven's Unreasonable Self-Serving Purchase Requirements**

68.     7-Eleven unreasonably charges its franchisees for inventory purchases.

69.     Specifically, the price difference between the required combined distribution centers ("CDC") and what franchisees could pay through independent channels is staggering.

70.     For instance, and by way of example only, 7-Eleven charges inflated inventory items on mainstay items, including: (i) Pepsi - $24 (CDC) v. $18 (independent); (ii) Milk - $3.59 (CDC) v. $3.07 (independent); and (iii) Poland Spring - $11 (CDC) v. $8 (independent).

71.     These inventory requirements are designed to benefit 7-Eleven, while simultaneously acting to the detriment of franchisees.

**7-Eleven's Channel Stuffing**

72.     7-Eleven unreasonably and illegally forces purchases upon its franchisees/employees.

73.     Specifically, 7-Eleven ships items to the stores without (a) an order from the franchisees, or (b) a need and/or demand for the product.

74.     Some of the items shipped, without request, include, but are not limited to:

    (a) Premium Nuts;

    (b) Milk, in excess of demand;

    (c) Flashlights;

    (d) Firewood; and

    (e) Assorted Snacks.

**Additional Fraudulent Practices**

Maintenance Fees

75.     7-Eleven's fraudulent business model requires that franchisees pay "maintenance" fees, when 7-Eleven has no intention of providing the promised service.

76.     Upon information and belief, the charges incurred are approximately $1000 per store, per month.

77.     Often, the repairs necessitated by faulty equipment are not covered by 7-Eleven's policy. In essence, franchisees are forced to pay for a worthless piece of paper.

78.     This scheme is just another money-generating scam run by 7-Eleven to the detriment of its franchisees.

Quarterly Audits

79.     Further, 7-Eleven conducts quarterly audits of all franchises.

80.     Upon information and belief, these audits are intended solely for the purpose of harassment.

81.     In fact, if and when a franchisee attempts to reconcile any issues with regards to the audit, 7-Eleven turns a deaf ear and stonewalls the franchisee's efforts.

## COUNT ONE
## Breach of the Implied Covenant of Good Faith and Fair Dealing

82.   All preceding paragraphs are incorporated by reference.

83.   The covenant of good faith and fair dealing is implied in every contract entered into in the State of New Jersey, including franchise agreements. Additionally, a franchisor's affirmative obligations under the N.J.F.P.A. incorporates the inherent contractual obligation that the franchisor act in good faith. See Maple Shade Motor Corp. v. KIA Motors of Am., Inc., 384 F.Supp.2d 770, 774 n.4 (D.N.J. 2005) (District Court construed N.J.F.P.A., N.J.S.A.56:10-1, *et seq.*, and held that the statutory requirement of "good cause" termination includes components of "good faith").

84.   Defendant, at all relevant times, had the obligation to act in good faith in order to maximize the best interests of Plaintiffs under the franchise agreements.

85. Defendant has breached its implied covenant of good faith and fair dealing by and through numerous acts that have harmed Plaintiffs' ability to operate their 7-Eleven franchises, by and through the following conduct:

(a) Failing to provide the requisite sixty (60) days' notice and an opportunity to cure any alleged default pursuant to <u>N.J.S.A.</u> 56:10-5;

(b) Entering franchisees' locations, in the middle of the day, and removing necessary equipment, including, but not limited to, Insta-Lottery Tickets and DVR Security System; and

(c) Ceasing to deliver foods, supplies and/or necessary equipment to Plaintiffs or requiring that recommended vendors do the same.

86. As a direct and proximate result of Defendant's repeated breaches of the covenant of good faith and fair dealing, Plaintiffs have sustained and continue to sustain substantial hardship and considerable monetary damage. Plaintiffs herein seek a declaration that 7-Eleven has acted in bad faith in connection with its obligation under the Franchise Agreements.

**WHEREFORE**, Plaintiffs seek relief against Defendant by way of an entry of an Order awarding:

(a) Compensatory damages;

(b) Consequential damages;

(c) Attorneys' fees and costs of suit; and

(d) Any other relief this Court deems equitable and just.

## COUNT TWO
## Violation of New Jersey Law Against Discrimination

87. All preceding paragraphs are incorporated by reference.

88.  The New Jersey Law Against Discrimination N.J.S.A. 10:5-1 to -42 ("NJLAD") makes it unlawful to subject people to differential treatment based on **race, creed, color, national origin, nationality, ancestry**, age, sex (including pregnancy), familial status, marital status, domestic partnership or civil union status, affectional or sexual orientation, gender identity or expression, atypical hereditary cellular or blood trait, genetic information, liability for military service, and mental or physical disability, or perceived disability.

89.  The NJ LAD prohibits unlawful discrimination in employment, housing, places of public accommodation, credit **and business contracts.**

90.  While 7-Eleven characterizes the parties' relationship as that of franchisor and independent contractor franchisee, 7-Eleven exerts significant control of the day to day operations of its franchisees so as to render them employees pursuant to the NJ LAD.

91.  As set forth herein, 7-Eleven's overarching control of franchisee store operations includes, but is not necessarily limited to, the following:

(a)  Control and final approval of employee payroll processing;

(b)  Requirement and control of  uniforms to be worn by 7-Eleven franchisees;

(c)  Daily camera surveillance of franchisee store operations;

(d)  Price setting of products sold at all franchisee locations;

(e)  Regularly confronting franchisees in the context of  unannounced and intrusive interrogations regarding their day-to-day operations and other practices

(f)  Taking the position that the 7-Eleven representatives have unfettered access to franchisee records, equipment and inventory as though it is owned by 7-Eleven, in the capacity as employer.

92. Alternatively, even when examining the parties' relationship as that of franchisor and

independent contractor, Plaintiffs are protected under the NJ LAD. Section 12(l) of the LAD is unrelated to the employment context, instead prohibiting discrimination in a business-to-business setting.  See Perlowski v. Elson T. Killam Associates, Inc., 384 N.J. Super. 467, 479 (Law Div. 2005) (attorney found to be an independent contractor rather than an employee could proceed under a 12(l) theory of liability); Marascia v. Cardio Medical Products, Inc., 2006 WL 2038503 (D.N.J. 2006) (plaintiff permitted to amend age discrimination complaint to add claim under 12(l) following defendant's assertion of affirmative defense that plaintiff was an independent contractor rather than an employee); Bubbles N' Bows, LLC v. Fey Publishing Co., 2007 WL 2406980 (D.N.J. 2007) (court accepted plaintiff's 12(l) claim alleging that Defendants engaged in discriminatory acts when they refused to print a line of greeting cards called "Alternative Lifestyles"); Horn v. Mazda Motor of America, Inc., 265 N.J. Super. 47 (App. Div. 1993) (Mazda's refusal to contract with plaintiff because of his addiction was a violation of 12(l) of the LAD).

93.  Section 10:5-12(l) of the New Jersey Law Against Discrimination (LAD) was passed by the New Jersey Legislature in 1977 as a formal amendment to the LAD.  This section provides, in pertinent part:

> **It shall be** an unlawful employment practice, or, as the case may be, an **unlawful discrimination**:
> . . . .
> **For any person to refuse to** buy from, sell to, lease from or to license, **contract with**, or trade with, provide goods, services or information to, **or otherwise do business with any other person on the basis of** the [protected class] of such other person . . . .[emphasis added.]

94.  7-Eleven and its management has consistently taken aggressive steps to subject Asian/Pacific Rim/Middle Eastern First/Generation American franchisees and store owners to unreasonable standards and has lodged untrue accusations at franchisees similarly situated in

direct response and retaliation for the FOA's efforts to combat racial prejudice within the 7-Eleven franchise system.

95.   Upon information and belief, 7-Eleven has also targeted other Asian/Pacific Rim/Middle Eastern First/Generation American franchisees who are members of the Metro NJ FOA and who have attempted to combat the racist dealings of Market and Zone Managers in the local area.

**WHEREFORE**, Plaintiffs demand the following judgment against Defendant, for racially based discrimination in violation of the NJLAD:

(a)   An order declaring and adjudging that Plaintiff has standing to bring claims under the NJ LAD pursuant to Section 12(a) and/or 12(l);

(b)   Compensatory damages;

(c)   Consequential damages;

(d)   Punitive Damages;

(e)   Pre-Judgment and post-judgment costs, plus interest;

(f)   Attorneys' fees and costs;

(g)   Any other relief this court deems equitable and just.

## COUNT THREE
## Violations of the New Jersey Wage and Hour Law

96.   All preceding paragraphs are incorporated by reference.

97.   7-Eleven purposefully and illegally mischaracterizes the parties' relationship as that of franchisor and independent contractor/franchisee in its franchise agreement.

98.   In actuality, and pursuant to the "economic reality" test in which an employer's classification of employees is measured under the FLSA, 7-Eleven imposes an employment relationship on its franchisees. Franchisees' day-to-day activities are aggressively micromanaged and controlled by 7-Eleven's Market Managers and Zone Managers, and franchisees such as

Plaintiffs (irrespective of their success or the number of 7-Eleven locations they "own') have no actual discretion or independent decision- making authority in running their locations.

99. Plaintiffs and others similarly situated routinely work sixty (60) to eighty (80) hours each week at their franchise locations, out of necessity and in order to properly service their clientele, and are not compensated for overtime benefits consistent with the statute's requirements. Due to the control over the day-to-day business operations of its franchisees, Plaintiffs and others similarly situated are employees afforded the protections of the New Jersey Wage and Hour Law, N.J.S.A. 34:11-56a, *et seq.*,

100. Plaintiffs and other franchisees similarly situated are also not provided FICA, worker's compensation insurance, social security withholding, a 401K or pension plan, or any other benefits associated with employees.

101. The New Jersey Wage and Hour Law, by incorporation of the Fair Labor Standards Act ("FLSA"), affords protection to "employees who are engaged in interstate commerce or in the production of goods for commerce, or who are employed by an enterprise engaged in commerce or in the production of goods for commerce".

102. 7-Eleven has been covertly foisting an undisclosed employment relationship upon its franchisees for its own benefit for many years, and has during this entire time period, cheated countless franchisees throughout its system out of basic benefits, and ultimately, their lively, requiring corrective action immediately.

**WHEREFORE** Plaintiffs seek the following:

(a) An Order declaring and adjudging that Plaintiffs and all franchisees similarly situated are *de facto* employees as defined under the FLSA, which has been incorporated into the New Jersey Wage and Hour Law, and are afforded

protections under the FLSA, New Jersey Wage and Hour Law, and any other available benefits under state law;

(b) Compensatory Damages;

(c) Recoupment of overtime benefits for the three (3) years preceding the filing of the Complaint in this matter;

(d) Recoupment for all benefits previously withheld from Plaintiffs for the three (3) years preceding the filing of the Complaint in this matter;

(e) Punitive Damages ;

(f) Attorney's fees and costs;

(g) Any other relief this court deems equitable and just.

## COUNT FOUR
### (Declaratory and Injunctive Relief –
### Violation of the New Jersey Franchise Practices Act, N.J.S.A 56:10-1, *et seq.*)

103. All preceding paragraphs are incorporated by reference.

104. Plaintiff Atalla is a franchisee as defined pursuant to N.J.S.A. 56:10-3.

105. Plaintiff Naik is a franchisee as defined pursuant to N.J.S.A. 56:10-3.

106. Plaintiff H. Patel is a franchisee as defined pursuant to N.J.S.A. 56:10-3.

107. Plaintiff J. Patel is a franchisee as defined pursuant to N.J.S.A. 56:10-3.

108. Plaintiff K. Patel is a franchisee as defined pursuant to N.J.S.A. 56:10-3.

109. Defendant is a franchisor as defined pursuant to N.J.S.A. 56:10-3.

110. Atalla, Naik, H. Patel, J. Patel, and K. Patel, as New Jersey franchisees, have spent millions of dollars on franchise fees, licenses, approvals, and related goods and services in operating his five (5) locations in accordance with their respective franchise agreements.

111. Plaintiffs reasonably relied upon the written and oral promises and representations of Defendant, and were induced to spend substantial time, effort, and money in an on-going attempt to develop and operate their 7-Eleven franchises and to comply with Defendant's rules and regulations.

112. 7-Eleven routinely attempts to constructively terminate franchisees' Franchise Agreements.

113. Defendant does so without demonstrating the requisite "good cause" and does not allow Plaintiffs to cure any alleged defaults.

114. In doing so, Defendant fails to comply with the notice provisions of N.J.S.A. 56:10-5 in that it fails to afford franchises the time allotted under the statute to cure any alleged deficiencies, and is attempting to prematurely terminate franchisees' Franchise Agreement.

115. Defendant's failure to provide proper notice of any alleged default has created an unreasonable standard of performance in violation of N.J.S.A. 56:10-7(e).

116. Rather than provide the requisite sixty (60) *days* to cure any alleged defect, Defendant routinely chooses to provide franchises a mere sixty (60) *minutes*.

117. Additionally, Defendant has violated N.J.S.A. 56:10-7(e), as more fully described herein. Plaintiffs therefore seek equitable relief, full reimbursement of costs, and/or damages for wrongful termination, which have all/or will irreparably damage Plaintiffs, including, but not limited to the irreparable damage to Plaintiffs' business reputations that Plaintiffs have caused within the respective franchise system.

**WHEREFORE**, Plaintiffs seek relief against Defendant 7-Eleven by way of an entry of an Order:

(a) Declaring and Adjudging that the termination of franchises without 60-days' notice are made without the requisite "good cause" required by the New Jersey Franchise Practices Act, N.J.S.A. 56:10-1, *et seq.*;

(b) Preliminarily and Permanently enjoining the termination of 7-Eleven franchises, until and unless proper notice of any default is served upon Plaintiff and is given sixty (60) days to cure any alleged default in accordance with N.J.S.A. 56:10-5;

(c) Preliminarily and Permanently enjoining Defendant, during the pendency of this matter, from interfering with the operation of 7-Eleven franchisees' business and customer relationships;

(d) Preliminarily and Permanently enjoining Defendant, until allowed by a Court of competent jurisdiction, from removing any equipment or inventory from any 7-Eleven franchise locations;

(e) Preliminarily and permanently enjoining Defendant during the pendency  of this action ceasing to finance operations at any/all 7-Eleven franchised stores;

(f) Awarding Compensatory Damages;

(g) Awarding Consequential Damages;

(h) Awarding Attorneys' fees and costs of suit; and

(i) Any other relief this Court deems equitable and just.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable.

## DESIGNATION OF TRIAL COUNSEL

Gerald A. Marks, Esq., is hereby designated as trial counsel.

Dated:  July 29, 2013

**MARKS & KLEIN, LLP**
Attorney for Plaintiffs


/s/ Gerald A. Marks, Esq.
Gerald A. Marks, Esq.
Louis D. Tambaro, Esq.
Evan M. Goldman, Esq.
63 Riverside Avenue
Red Bank, New Jersey 07701
Tel: 732-747-7100
Fax: 732-219-0625